(*Circuit Court of Cass County.*)

### H. H. Littlefield
#### vs.
### William Green.

(May Term, 1869.)

1. ELECTIONS—FRAUD—THROWING OUT ALL VOTES EXCEPT THOSE PROVEN LEGITIMATE OUTSIDE RECORD. In an election to remove a county seat, 2820 votes were cast in favor of removal in a precinct in which there were but 453 registered voters, *held*, that all the votes in the precinct would be thrown out except those proven outside the record, the circumstances of the case rendering it impossible to separate the legal from the illegal votes so as to count in the votes of the 453 legal voters, even though there were no votes cast in the precinct against removal.

2. ELECTIONS—VOTERS NATURALIZED IN COUNTY COURT. Votes cast by persons naturalized in the county court are illegal.

Contested election. Heard before Judge Arthur A. Smith. The facts are stated in the opinion of the court.

*J. Henry Shaw*, attorney for contestant.

SMITH, J.:—

On the 9th of April, A. D. 1867, an election was had for or against the removal of the county seat of Cass county, from Beardstown to Virginia, in said county.

The election was authorized by an act of the legislature passed that year.

The act provides that any citizen of said county, who may legally vote at said election may contest its legality, by giving a notice in writing of his intention so to do, to any other citizen of said county who may legally vote at said election in opposition to the vote cast by the person contesting, and said contest shall be conducted in compliance with existing laws of this state, with reference to the contest of elections for county officers, so far as the same may be applicable, R. S. 1845, chap. 37. This proceeding was commenced in the mode prescribed by statute, and was heard before three justices of the peace in said county, who made their certificate in favor of H. H. Littlefield, the contestant, and thereupon Green, the contestee, perfected his appeal to the circuit court of Cass county.

The principal contest was made on the returns from the Virginia precinct. It was claimed that illegal votes were cast in the Beardstown and Lancaster precincts; but no particular irregularity was shown to have occurred in the election.

It was admitted on the argument that if the Virginia vote was thrown out the majority would be against removal; if counted there would be a majority for removal. Virginia precinct cast at said election 2820 votes, and the judges of said election certify that 2820 votes were cast for removal, and none against removal. That precinct had at the date of the election an entire population of between 1700 and 1800, and about 450 legal votes. The names of the first 668 voters, as appears from the poll books, appears to have been registered and voted in alphabetical and numerical order. As for example, John Needham is the first name that appears upon the poll books, as having voted on the 9th day of April. His name appears first upon the register under "N," and the next name on the poll books that begins with "N" is registered immediately under the name of Needham, and so on all through these poll books and registers up to about No. 668. The voters appear to have been registered and voted in this

exact alphabetical and numerical order. From 668 to 955, the voters appear to have voted in alphabetical order from "A," running through the alphabet to "Z," and then from "Z" to "A" in the inverse order. From 955 to 985, this order is changed, and the names on the poll books appear from 4 to 6 together, commencing with the *same letter* of the alphabet. From 986 to 1191, the alphabetical order is resumed and this continues with an occasional break through the entire poll books to 2820.

It was not however claimed upon the argument by the contestee, that the names upon the poll books are genuine after 668, but that up to that number they are legal voters. But the proof showed that there were but 453 legal voters in the entire Virginia precinct, and that the names of these voters, instead of appearing first upon the poll books, read in consecutive order as they should have done, were scattered through the entire poll books from No. 1 to No. 2500.

Take, for example, the name of L. B. Freeman, who swears that he voted about 2 p. m., his number is 480. H. D. Freemen states that he voted not long after, and his name is 2572, and that J. M. Stribling and Joseph·Hunt voted about the time he did and their numbers are 2571 and 2573. The Freemans could not have voted so near together in point of time and their numbers be so far apart; and then H. D. Freeman, Stribling and Hunt were legal voters and their names should have appeared within the 453 or at least within 667, upon the theory of contestee that the first part of the poll books are genuine up to No. 667, and the balance fabricated, and not one of the witnesses are able or willing to explain how the names of those legal voters got into company of those that it is admitted are spurious and fictitious.

It was insisted upon the argument by contestee that the poll book of the Virginia precinct should be taken as evidence that as many as 400 or 450 legal voters had voted at that election for removal, and the question is here presented, whether the irregularities and frauds appearing upon the face of the poll books in connection with the other testimony

in the case destroys them as evidence of what they purport to be.

It is undoubtedly the rule that if the canvassing court can separate the legal from the illegal votes and reject the illegal ones, and that mere irregularities in the manner of conducting an election as a fraud on the part of the officers, will not vitiate, unless it is of so gross a character as to destroy all means of ascertaining the true results. *Piatt v. The People, ex rel. Am. Cent. R. R. Co.*, 29 Ill. 55, 72; *People v. Cook*, 8 N. Y. (4 Seld.) 68.

Our own supreme court has laid down this rule, "If an irregularity of which complaint is made, is shown to deprive no legal voter of his rights, or admitted a disqualified person to vote, if it casts no uncertainty on the result and has not been occasioned by the agency of a party seeking to derive a benefit from it, it may be overlooked. *Piatt v. The People*, 29 Ill. 72. Angel & Ames on Corporations, 94.

How then does the vote of the Virginia precinct appear in the light of this law. Do the irregularities and frauds admitted to have been practiced, place the true result in uncertainty; were disqualified persons admitted to vote, and was this procured by those seeking to derive benefit from their own frauds? It was admitted that out of the 2820 votes cast in that precinct for removal, that not more than 453 could be legal votes. But it is insisted by contestee that inasmuch as they have proved that upwards of 400 legal votes were in the Virginia precinct at that time, that they should be counted for removal.

But which 400 names on the poll book or ballots can the court count as legal votes? The first, second, third or fourth 400? For it is in proof that a large number of the names of those claimed to be legal votes do not appear upon the poll books within the first 400, or the second 400, but many of them appear as high up as 2,500.

It would be impossible, then, for the court to count the first 400 names on the poll books as legal votes. Where shall the court commence to count the legal votes, and where shall

it draw the line between the legal and illegal votes? Do not these facts cast an uncertainty over the whole result? But how do the poll books, registers and ballots appear in the light of the testimony of the officers who conducted the Virginia election.

It appears from the evidence that the Virginia interest was determined from the first to carry the election for removal at all hazards. And hence two of the board of registry, after acting two days, declined to act further; one for the reason that he would not be a party to the frauds that were about to be perpetrated, and the other for the reason that he could do more off the board than he could do on it, to further the ends to be obtained. Other men were selected who were not so tenderfooted upon questions of honesty, and the registers were completed, and they contained as the board say, 2820 names of legal voters in a precinct that contained about 1700 inhabitants all told.

And when one of this board was asked if any other person assisted in making the registers, he refuses to answer because it may subject him to a criminal prosecution. And when asked what guide they had to enable them to make the corrected registers for the Virginia precinct, he refuses to answer for the same reason.

On the day of election these officers shut themselves up in a school house, an aperature in the window is prepared through which to receive the ballots, and thus these officers of the law, after having solemnly sworn "that they would studiously endeavor to prevent fraud, deceit and abuse in conducting the election;" with their false and fabricated registers before them, commenced receiving the 2820 votes that they certify were cast on that day for removal in the Virginia precinct, when they must have known there were not to exceed 453 legal votes in the precinct. And when one of the judges is asked if 2820 different persons actually presented themselves to vote on that day he refused to answer because it might subject him to a criminal prosecution. And when asked how many names were on the poll books when

the polls closed he refuses to answer for the same reason. And when asked how many *bona fide* ballots were counted out of the box after the polls closed, he refuses to answer because it might subject him to criminal prosecution. And when asked whether any other persons acted as clerks in preparing the returns on the night succeeding the election in the Virginia precinct, he refuses to answer for the same reason. This is substantially the character of the testimony of all the officers conducting this election on this point.

One of them swears that he cannot account for the names appearing in alphabetical order on the poll books from "A" to "Z" and from "Z" to "A," but thinks that men voted in that order, a thing impossible and incredible. Another of these judges of election swears that they quit counting the ballots about midnight and lay down on the benches and slept until daylight; that they left the ballot-box sitting there *unsealed;* at daylight, they resumed counting, and went to breakfast at the usual hour and left the ballot-box in the house—other persons were in the house. This witness when asked whether he numbered all the ballots that were put in the ballot-box that day refuses to answer because it may criminate him, and asks *the protection of the court;* and yet this judge of election says he was the one whose duty it was to receive the ballots and put them into the ballot-box.

He refuses to answer whether he put in 1000 ballots, because it may criminate him, but thinks he may have put in 800—is quite certain he put in 600, but can't say that they were all legal votes. Another of these election officers swears that the names of the voters may have been called off by some person having a list of them outside and the ballots handed in through the hole by this person. Another witness swears that he voted through a hole in the window and could not see what was going on inside. And this is the class of testimony running through a thousand pages or more of manuscript, from which the court is asked to rescue the legal votes, and decide that at least 453 legal votes were cast for removal in the Virginia precinct. The difficulty is, that

these registers, poll books, ballots and testimony in connection therewith are so contradictory, mysterious, evasive, false and fraudulent that they are utterly unworthy of credit. If they could be personified and put upon the stand as witnesses, and made to speak their contents, they would not be believed for a moment in the lowest and most insignificant court in the country.

I think it may be fairly inferred from the evidence that some time before the election, the leading spirits of Virginia including many of her representative citizens, concocted a plan to carry this election by fraud or unfair means; and their only excuse was that they feared that Beardstown would be guilty of the same thing; and hence a board of registry was selected to carry out this fraudulent purpose. The ballot box on the day of election was stuffed with 2370 illegal votes; the poll books and the registers have on almost every page these badges of fraud; and the officers of this election have the effrontery to come forward and attempt to sustain it by the most unblushing testimony that was ever heard in a court of justice. The law will presume everything against a set of men who are shown to be pursuing such a fraudulent and dishonest course.

But it is insisted by the contestee that it is in proof that 453 legal voters voted in the Virginia precinct for removal, and that they ought to be counted, notwithstanding the frauds perpetrated by the officers of the election—that a legal voter ought not to be disfranchised on account of the misconduct of an election officer. But there is no proof outside of the poll books that 453 legal voters actually voted at said election.

There is some proof that this number resided in the precinct at that time, but the court cannot presume that they voted on the 9th of April, much less that they voted for removal. There is evidence *dehors* the poll books that about 50 legal voters did actually vote for removal in the Virginia precinct, and they should be counted; but there is no evidence except the poll books that the 400 voted at all. Their

names might have been furnished, for all that appears, the same as the 2370 fictitious ones that were voted that day.

As I have remarked, the irregularities at the Virginia election, the fraud on the part of the officers conducting it, and those who were to derive a benefit from its success; the unaccountable manner in which the names appear upon the poll books, the contradictory and unsatisfactory testimony introduced to support them, and the refusal on the part of the perpetrators of this fraud to give the court any insight into this labyrinth of uncertainties, renders these poll books and ballots entirely unworthy of credit, and renders it impossible to count the legal votes and reject the illegal ones.

It is probable that Virginia upon a fair and honest vote, could remove the county seat; such a vote would be sanctioned by the law of the land, and indorsed by the moral sense of the community. Were I, however, to declare the result in favor of Virginia, upon these facts, it would indeed have the force and effect of law, *but it would not be law*. It would be allowing the majority by fraud to trample upon the rights of the minority. It would be an indorsement by a court of justice of one of the most stupendous frauds of modern times.

It is insisted by the contestee that there were frauds committed in the Beardstown precinct, and so there were; but this did not justify fraud on the part of Virginia. But the court cannot offset one fraud against another and give the victory to the one committing the greatest fraud. But no fraud on investigation was charged upon the officers conducting the election in Beardstown. But it was proved that about 47 illegal votes were cast against removal by thirty-day men and those naturalized in the county court, and they must be thrown out.

So with Lancaster precinct, 194 illegal votes were cast for removal, and these must be thrown out. The court in these two cases has no difficulty in separating the true from the false. After rejecting the poll books, and other record evidence of the Virginia precinct, and allowing it all the legal

votes proved *dehors* the record (about fifty), it leaves a majority against removal of two hundred' and twenty-seven votes. :

It is due to the importance of this contest, to the able and distinguished counsel on both sides, and to the earnestness and zeal with which counsel for the contestee have urged their points, that I should have considered this contest well, carefully, and at length; and, while I may have erred, I have a consciousness of having done right.